## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF: | **Chapter 7** |
| Muwafak S. Rizek | Case No. 23-06821 |
| Debtor. | Hon. Judge David D. Cleary |
| | Filed: May 24, 2023 |
| The Huntington National Bank, NA, | |
| Plaintiff, | |
| v. | Adv. P. Case No. |
| Muwafak S. Rizek, | Hon. Judge David D. Cleary |
| Defendant. | |

## COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF INDEBTEDNESS UNDER 11 U.S.C. § 523

Plaintiff, The Huntington National Bank, NA ("Huntington"), by and through its attorneys, Taft Stettinius & Hollister, LLP, brings this Complaint to Determine Nondischargeability of Indebtedness Under 11 U.S.C. § 523 (the "Complaint") against Muwafak Rizek ("Rizek"), and in support thereof, states as follows:

### Preliminary Statement

1.      This Complaint seeks a determination that certain amounts owed to Huntington by Rizek are non-dischargeable in the above-captioned bankruptcy case pursuant to section 523 of title 11 of the United States Code (the "Bankruptcy Code").

2.      Rizek, as member and chief executive officer of IYS Ventures, opened three

1

business deposit accounts at Huntington that he used to defraud Huntington out of over $1.8 million. Rizek defrauded Huntington by providing the bank false information about his personal financial condition and the size and health of his company, IYS Ventures, to induce Huntington to provide IYS Ventures with an increased amount of immediate access to funds that Rizek transferred via Automated Clearing House ("ACH") transactions into IYS Ventures' Huntington accounts from accounts that he controlled at other financial institutions. Rizek knew that those other deposit accounts did not have sufficient funds for the other financial institutions to honor the ACH transactions. But, by the time that Huntington learned that the other financial institutions had dishonored the ACH Transactions, Rizek had already wire transferred the money out of Huntington to deposit accounts in the name of other entities that he controlled at other financial institutions. This fraudulent activity created overdrafts of over $1.8 million in the IYS Ventures' Huntington accounts. Prepetition, Rizek ignored all of Huntington's demands for return of the ill-gotten funds to cover the overdrafts.

3.     Before Rizek filed his bankruptcy case, Huntington sued Rizek, IYS Ventures, I Mart, Leanne and Kenan (defined below) (Case No. 23-cv-01358 ND Ill.) and on March 16, 2023 Huntington obtained a prejudgment attachment to several bank accounts and other assets that Rizek controlled through IYS Ventures and other entities he controlled. Thereafter, on May 23, 2023, Rizek sought chapter 11 bankruptcy protection for IYS Ventures (23-06782, ND Ill.) and on May 24, 2023, Rizek filed his voluntary petition for chapter 7 bankruptcy under which this adversary proceeding is filed based on Rizek's fraudulent scheme.

## Jurisdiction

4.     Huntington is a national banking association that maintains its corporate headquarters in the state of Ohio, with its main office at 17 South High Street, Columbus, Ohio

43215.

5.      Rizek is an individual who is the Debtor in the main bankruptcy proceeding under which this adversary proceeding is commenced. According to his bankruptcy petition, Rizek resides at 7924 Keystone Road, Orland Park, Illinois 60462.

6.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§157(b)(1) and 1334(b).

7.      Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

8.      This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

## Related Entities Owned and/or Controlled by Rizek

9.      IYS Ventures is an Illinois limited liability company ("IYS Ventures"). Upon information and belief, Rizek is the sole member of IYS Ventures.

10.      I Mart is a Minnesota limited liability company ("I Mart"), and Rizek is the only identified manager and is the sole member of I Mart.

11.      Leanne is an Indiana limited liability company ("Leanne"), and Rizek is the only identified Manager, and upon information and belief, Rizek is the sole member of Leanne.

12.      Kenan, Inc. is an Indiana corporation ("Kenan"). Rizek is identified as its President.

## Rizek's Fraudulent Banking Scheme

**A. Rizek Entered Into The Deposit Account Agreement With Huntington And Opened Three Business Checking Accounts In IYS Ventures' Name.**

13.      Huntington provides various financial and cash management services for individuals and businesses.

14. On May 5, 2020, Rizek, on behalf of IYS Ventures, opened an Unlimited Plus Checking Account with Huntington in IYS Ventures' name, with an account number ending in x8201 ("Account 8201").

15. In order to open Account 8201, Rizek signed the Limited Liability Resolutions to Open and Maintain a Bank Account or Safe Deposit Box ("Account 8201 Resolutions") and executed a Business Signature Card for Account 8201 ("Account 8201 BSC"). True and correct copies of the Account 8201 Resolutions and Account 8201 BSC are attached hereto as **Exhibit 1** and **Exhibit 2**, respectively.

16. On June 7, 2022, Rizek, on behalf of IYS Ventures, opened a second Unlimited Plus Checking Account with Huntington in IYS Ventures' name, with an account number ending in x2014 ("Account 2014").

17. In order to open Account 2014, Rizek signed the Resolutions to Open and Maintain a Bank Account or Safe Deposit Box ("Account 2014 Resolutions") and executed a Business Signature Card for Account 2014 ("Account 2014 BSC"). True and correct copies of the Account 2014 Resolutions and Account 2014 BSC are attached hereto as **Exhibit 3** and **Exhibit 4**, respectively.

18. The same day, Rizek, on behalf of IYS Ventures, opened a third Unlimited Plus Checking Account with Huntington in IYS Ventures' name, with an account number ending in x2027 ("Account 2027," and sometimes collectively with Account 8201 and Account 2014, the "Huntington Accounts").

19. As with the first two Huntington Accounts, in order to open Account 2027, Rizek signed the Resolutions to Open and Maintain a Bank Account or Safe Deposit Box ("Account 2014 Resolutions," and sometimes collectively with the Account 8207 Resolutions and Account

2014 Resolutions, the ("Resolutions") and executed a Business Signature Card for Account 2027 ("Account 2027 BSC," and sometimes collectively with the Account 8207 BSC and Account 2014 BSC, the "Business Signature Cards"). True and correct copies of the Account 2027 Resolutions and Account 2027 BSC are attached hereto as **Exhibit 5** and **Exhibit 6**, respectively.

20.     By executing the Resolutions, Rizek, on behalf of IYS Ventures, agreed that "overdrafts, if any, shall not be considered to be a loan[.]" See Exs. 1, 3, 5.

21.     By executing the Business Signature Cards, Rizek, on behalf of IYS Ventures, agreed to be bound by the Business Deposit Account Agreement ("Deposit Account Agreement") and the terms contained therein for all three Huntington Accounts. A true and correct copy of the Deposit Account Agreement is attached hereto as **Exhibit 7**.

22.     Pursuant to the Deposit Account Agreement, IYS Ventures has "no right to overdraw [the Huntington] Account[s.]" See Ex. 7, p. 7.

23.     Under the Deposit Account Agreement, in the event that IYS Ventures overdrew the Huntington Accounts, Rizek, on behalf of IYS Ventures, agreed that it "must pay [Huntington] immediately for the amount of the overdraft and any associated fees." Id.

24.     Pursuant to Section 13 of the Deposit Account Agreement, Rizek, on behalf of IYS Ventures, agreed to "indemnify [Huntington] and hold [Huntington] harmless from any claim (including reasonable attorneys' fees)" arising as a result of any debt owed by IYS Ventures to Huntington. Id. at p. 11.

**B.      Mechanics Of ACH And Wire Transfers.**

25.     ACH transfers are electronic money transfers into an account at one financial institution (the "Receiving Account") from an account at another financial institution (the "Sending Account").

26.    ACH transfers are initiated when an account holder causes one financial institution to send an instruction through the ACH system to the other financial institution to complete the transfer. The financial institution that sends this instruction is referred to in the banking industry as the Originating Depository Financial Institution ("ODFI"). The financial institution that receives the instruction is referred to in the banking industry as the Receiving Depository Financial Institution ("RDFI").

27.    That is, an account holder can initiate an ACH transfer by causing the ODFI to instruct the RDFI to debit a Sending Account in a specified amount and transmit the funds to a Receiving Account at the ODFI.

28.    Typically, an ACH transfer takes about two (2) banking days to settle. In other words, the Receiving Account at the ODFI does not immediately receive the funds while the RDFI processes the transfer. Nonetheless, most financial institutions that permit their customers to use ACH transfers, including Huntington, make funds immediately available in the Receiving Account during this period (the "ACH Float Period"). The funds made available during the ACH Float Period are referred to here as "ACH Float Funds."

29.    The "ACH Limit" for a deposit account refers to the maximum amount of ACH Float Funds to which the Receiving Account holder has immediate access during the ACH Float Period.

30.    An ACH transfer that cannot be completed for any reason (i.e., insufficient funds in the Sending Account, closure of the Sending Account, etc.) is referred to as a "Dishonored Transaction."

31.    Dishonored Transactions are "returned" to the RDFI when the ODFI never receives the funds requested as part of the ACH transaction.

32.     Unlike an ACH transfer, a wire transfer constitutes a transmission of funds from a Sending Account to a Receiving Account that settles immediately. In other words, funds sent via a wire transfer are immediately deducted from the Sending Account, are immediately available in the Receiving Account, and the transfer instruction cannot be "returned" to the financial institution from where the wire transfer was originated.

**C.  Rizek on his and IYS Ventures' behalf Made False Representations To Huntington Regarding Their Asset And Net Worth Valuations To Increase Their Access To Funds.**

33.     On or around June 13, 2022, Rizek spoke by telephone with Huntington employee Jimmy Liu ("Liu") about Rizek's interest in certain Huntington commercial banking products.

34.     During this conversation, Rizek represented to Huntington that IYS Ventures operates and controls around seventy (70) gas stations. Upon information and belief, this information is materially false because IYS Ventures does not own or control anywhere near that many gas stations.

35.     Rizek also represented that he intended to move all of IYS Ventures' operating accounts from a different banking entity, JPMorgan Chase & Co. ("Chase"), to Huntington.

36.     On or around June 17, 2022, Rizek provided to Huntington employee Mark Freeman ("Freeman") a Statement of Revenue and Expenses and Balance Sheet for IYS Ventures for the period of January 1, 2022 through May 31, 2022 ("IYS Financial Statements"). The IYS Financial Statements stated that IYS Ventures had assets valued at $27,759,716.93. Upon information and belief, the IYS Financial Statements are materially false.

37.     Next, Rizek also provided Huntington with a list of eight properties cumulatively valued at $7,120,000.00 ("Rizek Property List"). Rizek claimed that he personally owned the

properties listed in the Rizek Property List free and clear of any liens. Upon information and belief, the Rizek Property List is materially false.

38.     Finally, Rizek provided Mr. Freeman with signed personal financial statements representing a personal net worth of $31,905,679.00 ("Rizek Financial Statements"). Upon information and belief, the Rizek Financial Statements are materially false.

39.     On or around July 5, 2022, Rizek spoke with Huntington employee William Beher ("Beher") and requested that Account 8201's ACH Limit be increased from $75,000.00 to $150,000.00. At this time, Account 8201 was the only Huntington Account with ACH origination services.

40.     On or around July 11, 2022, based on Rizek's representations about Rizek's and IYS Ventures' financial status and ability to generate cash flow, the other two Huntington Accounts were set up for ACH origination services and each of the three Huntington Accounts was given an ACH Limit of $150,000.00.

**D.  Rizek, On Behalf Of IYS Ventures, Agreed To The Terms Of Huntington's Treasury Management Services, Which Allowed Rizek And IYS Ventures To Remotely Send Wire Transfers Out Of The Huntington Accounts.**

41.     In conjunction with Huntington's financial and cash management services, Huntington also provides treasury management services which, among other things, allow its customers to remotely access and transfer funds through Huntington's online platform without having to physically visit a Huntington branch location ("Treasury Management Services").

42.     Huntington's Treasury Management Services include remote access to both ACH and wire transfers.

43.     On or around June 8, 2022, Rizek, on behalf of IYS Ventures, signed and entered into the Treasury Management Services Agreement with Huntington ("TM Services Agreement")

to gain access to Huntington's Treasury Management Services. A true and correct copy of the TM Services Agreement and the Authorization and Agreement for TM Services are attached hereto as **Exhibit 8** and **Exhibit 9**, respectively.

44.     Under Part I, Section 2 of the TM Services Agreement, Rizek for IYS Ventures agreed to "pay [Huntington] the applicable fees and charges disclosed to you for use of [Huntington's services]" and that Huntington was "authorized to charge the fees and charges to any of [the Huntington] Account(s) when due[.]" Ex. 8, p. 3.

45.     Under the TM Services Agreement, in the event of an overdraft, Rizek, on behalf of IYS Ventures, agreed to "repay [Huntington] immediately, without demand, the amount of such overdraft plus any overdraft fees, charges or interest[.]" Id.

46.     Specifically regarding wire transfers, "[i]f an [o]verdraft is created in an [a]ccount in order to complete a wire transfer, [IYS Ventures] agree[d] to immediately repay [Huntington], and [IYS Ventures] agree[d] and authorize [Huntington] to debit any of [the Huntington] Accounts [] in the amount equal to the overdraft and applicable fees." Id. at p. 35.

47.     All three Huntington Accounts are subject to the TM Services Agreement. See id., Schedule A.

48.     On or around September 19, 2022, Huntington enabled each of the Huntington Accounts for Treasury Management Services, which allowed Rizek to remotely send funds via wire transfer out of the Huntington Accounts.

**E.  Rizek Continued To Make False Representations To Increase IYS Ventures' ACH Limit.**

49.     In September 2022, Rizek requested an increase in IYS Ventures' ACH Limit for the Huntington Accounts.

50. Rizek represented to Huntington that he was in the process of moving all of IYS Ventures' operating accounts from Chase to Huntington and that an ACH limit increase would, among other things, facilitate the transfer of IYS Ventures' operating accounts.

51. Based on Rizek's representations, Huntington increased the ACH Limit from $150,000.00 to $350,000.00 for each of the Huntington Accounts.

52. In or around late September, Rizek requested another ACH Limit increase for the Huntington Accounts.

53. Rizek represented to Huntington that he was still in the process of moving all IYS Ventures' operating accounts to Huntington and that he required an increase in IYS Ventures' ACH Limit to cover IYS Ventures' daily accounts payable, which, according to Rizek, totaled about $650,000.00 per day.

54. On or around September 30, 2022, based on Rizek's representations, Huntington increased the ACH Limit to $650,000.00 for each of the Huntington Accounts.

55. On or around October 24, 2022, based on Rizek's representations that he was finalizing the transfer of IYS Ventures' operating accounts to Huntington, the Huntington Accounts were approved for a final increase of the ACH Limit from $650,000.00 to $1,300,000.00 for each of the Huntington Accounts.

**F. Rizek Carried Out His Fraudulent Scheme By Overdrawing Funds From The Huntington Accounts To Send Funds To Accounts Rizek Controlled.**

56. Beginning in September 2022, Rizek caused IYS Ventures to initiate ACH Transactions that pulled funds into the Huntington Accounts from Sending Accounts held by entities affiliated with IYS Ventures and Rizek, including accounts at Chase, Business First Bancshares, Inc., Republic Bank of Chicago, BMO Harris Bank, N.A., Greenwoods State Bank, Old National Bank, and First National Bank Minnesota ("ACH Sending Accounts").

57. However, the ACH Sending Accounts often did not have sufficient funds to settle the ACH transfers to the Huntington Accounts, resulting in numerous dishonored transactions (the "Dishonored ACH Transactions").

58. During the ACH Float Periods for the various Dishonored ACH Transactions and before the Dishonored ACH Transactions settled, Huntington immediately made the ACH Float Funds for the respective Dishonored ACH Transactions available to IYS, up to the aggregate ACH Limit.

59. Rizek took advantage of the ACH Float Period and initiated wire transfers of the ACH Float Funds from the Huntington Accounts to accounts Rizek controlled and which were held by Rizek, IYS Ventures, Leanne, I Mart, and/or Kenan at third-party financial institutions ("Wire Receiving Accounts").

**(i)    Rizek's Use Of ACH Float Funds In Account 8201.**

60. In October 2022, Rizek caused IYS Ventures to initiate 79 ACH transactions to and deposited checks into Account 8201.

61. In November 2022, Rizek caused IYS Ventures to initiate 103 ACH transactions to and deposited 12 checks into Account 8201.

62. Of the 182 ACH transfers to Account 8201 between October 1, 2022, and November 30, 2022, 87 were returned to the ACH Sending Accounts due to insufficient funds in the ACH Sending Accounts. 22 checks were also returned for insufficient funds in the accounts on which the checks were drawn.

63. The total amount of the 87 ACH transfers and the 22 checks that were returned was $11,064,708.47.

64.     During the ACH Float Periods for the Dishonored ACH Transactions in October 2022, Rizek caused wire transfers in the total amount of $1,299,307.00 of the ACH Float Funds available in Account 8201 in October 2022 to the Wire Receiving Accounts.

65.     During the ACH Float Periods for the Dishonored ACH Transactions in November 2022, Rizek caused wire transfers in the total amount of $2,620,060.95 of the ACH Float Funds available in Account 8201 in November 2022 to the Wire Receiving Accounts.

66.     Rizek caused wire transfers from Account 8201 to the Wire Receiving Accounts in the total amount of $3,919,367.95 using the ACH Float Funds between October 1, 2022 and 12 November 30, 2022. This created an overdraft balance of $501,013.05 in Account 8201 by November 30, 2022.

**(ii)     Rizek's Use Of ACH Float Funds In Account 2014.**

67.  In September 2022, Rizek caused IYS Ventures to initiate 13 ACH transactions to Account 2014.

68.     In October 2022, Rizek caused IYS to initiate 48 ACH transactions to and deposited 4 checks into Account 2014.

69.     In November 2022, Rizek caused IYS Ventures to initiate 183 ACH transactions to and deposited 7 checks into Account 2014.

70.     Of the 244 ACH transfers to Account 2014 between September 1, 2022 and November 30, 2022, 91 were returned to the ACH Sending Accounts due to insufficient funds in the ACH Sending Accounts. 11 checks were also returned for insufficient funds in the accounts on which the checks were drawn.

71.     The total amount of the 91 ACH transfers and the 11 checks that were returned was $11,158,496.89.

72. During the ACH Float Periods for the Dishonored ACH Transactions in September 2022, Rizek caused wire transfers of $364,543.00 of the ACH Float Funds available in Account 2014 in September 2022 to the Wire Receiving Accounts.

73. During the ACH Float Periods for the Dishonored ACH Transactions in October 2022, Rizek caused wire transfers of $1,709,706.00 of the ACH Float Funds available in Account 2014 in October 2022 to the Wire Receiving Accounts.

74. During the ACH Float Periods for the Dishonored ACH Transactions in November 2022, Rizek caused wire transfers of $1,812,442.08 of the ACH Float Funds available in Account 2014 in November 2022 to the Wire Receiving Accounts.

75. Rizek and caused wire transferred from Account 2014 to the Wire Receiving Accounts a total of $3,886,691.08 using the ACH Float Funds between September 1, 2022 and November 30, 2022. This created an overdraft balance of $757,337.29 in Account 2014 by November 30, 2022.

**(iii)     Rizek's Use Of ACH Float Funds In Account 2027.**

76. In September 2022, Rizek caused IYS Ventures to initiate 43 ACH transactions to Account 2027.

77. In October 2022, Rizek caused IYS to initiate 110 ACH transactions to and deposited 3 checks into Account 2027.

78. In November 2022, Rizek caused IYS Ventures to initiate 189 ACH transactions to and deposited 7 checks into Account 2027.

79. Of the 342 ACH transfers to Account 2027 between September 1, 2022, and November 30, 2022, 104 were returned to the ACH Sending Accounts due to insufficient funds at

the ACH Sending Accounts. 10 checks were also returned for insufficient funds in the accounts on which the checks were drawn.

80.     The total amount of the 104 ACH transfers and the 10 checks for Account 2027 that were returned was $13,001,900.81.

81.     During the ACH Float Periods for the Dishonored ACH Transactions in September 2022, Rizek wire transferred $1,088,452.00 of the ACH Float Funds available in Account 2027 in September 2022 to the Wire Receiving Accounts.

82.     During the ACH Float Periods for the Dishonored ACH Transactions in October 2022, Rizek wire transferred $1,686,713.85 of the ACH Float Funds available in Account 2027 in October 2022 to the Wire Receiving Accounts.

83.     During the ACH Float Periods for the Dishonored ACH Transactions in November 2022, Rizek wire transferred $2,487,873.00 of the ACH Float Funds available in Account 2027 in November 2022 to the Wire Receiving Accounts.

84.     Rizek wire transferred from Account 2027 to the Wire Receiving Accounts a total of $5,263,038.85 using the ACH Float Funds between September 1, 2022 and November 30, 2022. This created an overdraft balance of $667,306.33 in Account 2027 by November 30, 2022.

**G. Huntington's Demands To Cover The Overdraft Are Ignored.**

85.     As of December 6, 2022, the Huntington Accounts were overdrawn by $1,880,075.01 in the aggregate (the "Overdrafts").

86.     On December 6, 2022, Huntington sent a demand letter to Rizek and the each of the entities he used to create the overdraft balance for immediate payment of the Overdraft ("Demand Notice"). A true and correct copy of the Demand Notice is attached hereto as **Exhibit 10**.

87.     Neither Rizek nor any of Rizek's businesses (IYS Ventures, I Mart, Leanne or Kenan) have responded to the Demand Notice or otherwise taken steps to cover the Overdraft.

**H. Huntington Initiates Prepetition Litigation Against Rizek, IYS Ventures, I Mart, Leann And Kenan.**

88.     On March 6, 2023, Huntington filed suit against Rizek, IYS Ventures, I Mart, Leanne and Kenan Seeking judgment and recovery for the amount of the Overdraft.

89.     The District Court Complaint contains claims against Rizek and each of the named entities Rizek controls for several civil claims including fraud, wire fraud, conspiracy to commit wire fraud, bank fraud, conspiracy to commit bank fraud, civil conspiracy and conversion.

90.     On March 16, 2023, Huntington obtained a prejudgment attachment order against Rizek, IYS Ventures, I Mart, Leann and Kenan.

91.     Thereafter, Rizek and IYS Ventures filed their petitions for bankruptcy under chapter 7 and chapter 11 on May 24, 2023 and May 23, 2023 respectively which stayed the district court litigation as against Rizek and IYS Ventures.

92.     Following Rizek's bankruptcy filing, Huntington obtained a judgment against I Mart, Leanne and Kenan in the amount of $5,829,551.10 which represents the principal amount of the Overdrafts of $1,880,075.01, treble damages, and pre-judgment interest on Plaintiff's actual damages, attorney fees, and costs. The judgment against I Mart, Leanne and Kenan is attached as **Exhibit 11**.s

**I. Rizek's Representations In His Bankruptcy Schedules And Statement Of Financial Affairs**

93.     On May 24, 2023, in fewer than 12 months from the time that Rizek furnished the Rizek Financial Statements, Rizek Property List and IYS Financial Statements to Huntington, Rizek filed his petition for individual chapter 7 bankruptcy protection.

94.     On June 7, 2023 Rizek filed his Schedules A/B through J ("Schedules") and his Declaration About an Individual Debtor's Schedules ("Declaration") and signed the Declaration under penalty of perjury that everything contained in the Schedules is true and correct (ECF No. 12).

95.     On June 7, 2023 Rizek also filed his Statement of Financial Affairs ("SOFA") which Rizek likewise signed under penalty of perjury that the disclosures in his SOFA are true and correct (ECF No. 14).

96.     Rizek thereafter filed his Amended Schedules and an Amended SOFA on June 19, 2023 and again, Rizek signed the Declaration and SOFA under penalty of perjury attesting that the information contained in the Amended Schedules and Amended SOFA is true and correct (ECF No. 26; ECF No. 28).

97.     On June 28, 2023, Rizek filed his Second Amended Schedule A/B and signed the Declaration under penalty of perjury attesting that the information contained in the Second Amended Schedule A/B is true and correct (ECF No. 33).

98.     According to Rizek's Schedules at A/B and each of the amended Schedules at A/B, his personal real estate holdings are comprised of one single family residence which is identified as an investment property with a value of $110,000.00.

99.     According to Rizek's Second Amended Schedules at A/B he holds a 100 percent ownership interest in several companies listed with a $0.00 value assigned to each of his interests. This includes a 100 percent ownership interest in IYS Ventures, IMart, Leanne, and Kenan for which he valued his interest at $0.00 for each company.

100.    Rizek's Second Amended Schedules at A/B includes property described as "IYS Ventures, LLC Loan to [sic] Shareholders" with a value of $1,476,286.00, the first of Rizek's amendments to schedules that disclose this interest.

101.    Other than the IYS Ventures loan described herein at paragraph 100. Rizek's Second Amended Summary of Schedules identifies a total of $124,720.00 in assets including his real estate holdings described herein at paragraph 98.

102.    According to Rizek's Amended Schedules at Schedule I and Schedule J, he has a total net monthly income of $2,706.50 and monthly expenses of $3,180.00 leaving a monthly budget shortfall of $473.50 (ECF No. 26).

103.    Rizek's Amended Statement of Financial Affairs identifies income from employment or operation of a business in 2022 of $26,000.00 and 2021 of $275,474.00; rental income of $37,200 in 2022 and 2023 respectively and investment income of $37,200 in 2022 and $194,540 in 2023.

104.    According to Rizek's Amended Statement of Financial Affairs, he has not sold or transferred any property including real estate in the two years prior to the Petition Date.

### Count I
### False Pretenses, False Representations and Actual Fraud

105.    Huntington re-alleges and incorporates by reference Paragraphs 1 through 104 as if they were fully set forth herein.

106.    11 U.S.C. §523(a)(2)(A) excepts from an individual's discharge a debt incurred by the debtor resulting from money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

107.     Rizek made materially false statements made in his telephone call with Huntington representative Liu.

108.     In particular, Rizek represented to Huntington that his businesses owned and controlled 70 gas stations which was a materially false statement.

109.     Rizek knew that neither Rizek nor IYS Ventures owned, operated, or controlled anywhere near seventy (70) gas stations.

110.     Rizek's materially false statements, including, but not limited to, his statements regarding the size and scale of his gas station business, are false statements upon which Huntington reasonably relied, Huntington approved an increase in the ACH Limit from $75,000.00 to $150,000.00 for each of the three Huntington Accounts.

111.     Rizek made misrepresentations regarding his intent to move IYS Ventures' operating accounts to Huntington and regarding his and IYS Ventures' financial status as a part of a scheme to induce and defraud Huntington to increase the daily ACH Limits for the Huntington Accounts and allow Rizek and IYS Ventures access to increased funds to further their fraudulent scheme.

112.     Rizek made the aforementioned misrepresentations knowing that Rizek had no intention to transfer IYS Ventures' operating accounts to Huntington and as part of a scheme to defraud Huntington.

113.     Based on Rizek's false representations to Huntington upon which Huntington reasonably relied, including but not limited to his false statements regarding the transfer of IYS Ventures' operating accounts to Huntington, Huntington increased the ACH Limit to $350,000.00 for each of the three Huntington Accounts.

114.     Then, based on Rizek's materially false statements including but not limited to the false statement that his daily accounts payable totaled about $650,000.00 per day, a false statement upon which Huntington reasonably relied, Huntington approved an increase in the ACH Limit from $350,000.00 to $650,000.00 for each of the three Huntington Accounts.

115.     Huntington reasonably relied upon Rizek's materially false statements including but not limited to the false statement that he was finalizing the transfer of IYS Ventures' operating accounts to Huntington when Huntington approved an third and final increase in the ACH Limit from $650,000.00 to $1,300,000.00 for each of the three Huntington Accounts.

116.     Huntington's reliance was reasonable given the fact that daily deposits and withdrawals were consistent with the Rizek's false statements regarding the daily dollar amount of IYS Ventures' account transactions.

117.     As a direct and proximate result Rizek's materially false statements to Huntington, Rizek was able to cause the Overdrafts which resulted in a total loss of $1,880,075.01 to Huntington and which was moved to accounts owned and/or controlled by Rizek at other financial institutions.

118.     As a result of Defendants' bank fraud which was executed through Rizek's false representations, Huntington is entitled to a nondischargeable judgment pursuant to 11 U.S.C. §523(a)(2)(A) and to recover $5,829,551.10, which is the amount of the district court judgment against I Mart, Leanne and Kenan, plus the cost of bringing this suit and additional reasonable attorney's fees.

WHEREFORE, Plaintiff, THE HUNTINGTON NATIONAL BANK, respectfully requests that this Court enter judgment in its favor and against Defendant MUWAFAK RIZEK pursuant to 11 U.S.C. §523(a)(2)(A) determining as nondischargeable, the debt of threefold of

$1,880,075.01, plus the cost of the suit and reasonable attorney's fees; and grant all other relief to

it the Court deems equitable and just.

**Count II**
**False Pretenses, False Representations and Actual Fraud**

119.     Huntington re-alleges and incorporates by reference Paragraphs 1 through 118 as if they were fully set forth herein.

120.     11 U.S.C. §523(a)(2)(B) excepts from an individual's discharge a debt incurred by the debtor resulting from money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by use of a statement in writing that is materially false; respecting the debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and that the debtor caused to be made or published with intent to deceive.

*False Statements Attending to Rizek's Financial Condition*

121.     Rizek provided IYS Financial Statements to Huntington representing that IYS Ventures held assets valued at $27,759,716.93, which upon information and belief is materially false based on Rizek's bankruptcy schedules, which disclose Rizek's 100 percent interest in IYS Ventures valued at $0.00.

122.     Rizek produced the Rizek Property List to Huntington disclosing a personal real estate ownership interest in eight properties free and clear of liens with a  cumulative value of $7,120,000.00. Based on Rizek's Bankruptcy Schedules and Statement of Financial Affairs, Rizek's statements to Huntington contained in the Rizek Property List are materially false.

123.     Rizek provided Huntington the signed Rizek Financial Statements representing that Rizek had a net worth of $31,905,679.00. Upon information and belief and based on Rizek's Bankruptcy Schedules and Statement of Financial Affairs, Rizek's statements in the Rizek Property List are materially false.

124.    Rizek knew that the IYS Financial Statements, the Rizek Property List, and the Rizek Financial Statements were grossly inflated and/or inaccurately represented Rizek's and IYS Ventures' financial status and ability to generate cash flow.

***Fraud Through Initiating ACH Transfers In Excess Of Funds Available To Rizek***

125.    Rizek initiated ACH transfers in writing from the ACH Sending Accounts into the Huntington Accounts to induce Huntington to make available to IYS Ventures the ACH Float Funds that Rizek and IYS Ventures then used the ACH Float Funds to send to wire transfers to the Wire Receiving Accounts.

126.    Rizek and IYS Ventures knew that the ACH Sending Accounts did not have sufficient funds to cover the ACH transfers to the Huntington Accounts and thus that the wire transfers from the Huntington Accounts would create the Overdraft.

127.    Huntington relied on Rizek's and IYS Ventures' intentional misrepresentations regarding his financial condition and approved ACH Limit increases for the Huntington Accounts and made the ACH Float Funds available to IYS Ventures.

128.    Huntington had a reasonable basis to believe that Rizek was in the process of moving IYS Ventures' operating accounts to Huntington, that Rizek's and IYS Ventures' assets and financial condition were sufficient to justify the ACH Limit increases, and that the ACH Sending Accounts contained sufficient funds to cover the wire transfer transactions to the Wire Receiving Accounts.

129.    Huntington's reliance was further justified by the written agreement Rizek signed for IYS Ventures which agreed to compensate Huntington for any overdrawn funds from the Huntington Accounts, plus other costs and fees, pursuant to the Deposit Account Agreement and the TM Services Agreement.

130.     Huntington had no reason to believe at the time that it made the ACH Float Funds available in the Huntington Accounts that the ACH Sending Accounts did not have sufficient funds, that the Dishonored ACH Transactions would be dishonored and returned, or that Huntington would never receive funds from the ACH Sending Accounts or otherwise from Rizek or IYS Ventures.

131.     By the time Huntington received notice of the Dishonored Transactions, Rizek had already sent the ACH Float Funds via wire transfer to the Wire Receiving Accounts.

132.     As a result of Rizek's intentional misrepresentations and fraudulent scheme, and Huntington's justifiable reliance upon Rizek's and IYS Ventures' misrepresentations, Huntington suffered damages, in the amount of the Overdrafts and other costs and attorneys' fees associated with Huntington's efforts to recover the Overdraft Funds.

133.     As a direct and proximate result of Rizek's materially false statements upon which Huntington reasonably relied, Rizek was able to cause the Overdrafts which resulted in a total loss of $1,880,075.01 to Huntington, which is the amount that Rizek transferred to accounts owned and/or controlled by Rizek at other financial institutions plus other costs and attorney fees.

*Wire Fraud*

134.     Under 18 U.S.C. §1343, a party commits wire fraud where they "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

135.     Rizek committed wire fraud by obtaining the ACH Float Funds in the Huntington Accounts by means of written false or fraudulent pretenses, intentional misrepresentations, and

contrary to the terms in the Deposit Account Agreement and the TM Services Agreement, and transmitting such funds via multiple transfers "by means of wire . . . in interstate . . . commerce" to the Wire Receiving Accounts that Rizek controlled.

136. Rizek as the controlling owner of IYS Ventures obtained access to the ACH Float Funds by initiating ACH transfers from the ACH Sending Accounts to the Huntington Accounts when Rizek knew or should have known that the ACH Sending Accounts did not have sufficient funds.

137. Moreover, Rizek, through IYS Ventures, obtained access to an increased amount of ACH Float Funds in the Huntington Accounts by falsely representing in writing, his and IYS Ventures' financial status and ability to generate cash flow.

138. Upon information and belief, Rizek participated in this fraudulent scheme because Rizek is an officer and 100 percent owner and/or agent of IYS Ventures, I Mart, Leanne, and Kenan.

*Bank Fraud*

139. Under 18 U.S.C. §1344, a party commits bank fraud when it "knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]"

140. Huntington is a financial institution as defined in the foregoing statute. Rizek committed bank fraud by executing a scheme to defraud Huntington.

141. Rizek also committed bank fraud by obtaining the ACH Float Funds in the Huntington Accounts by means of written false or fraudulent pretenses, intentional

misrepresentations attending to Rizek's financial condition and contrary to the terms in the Deposit Account Agreement and the TM Services Agreement, and transmitting such funds via multiple wire transfers to the third-party Wire Receiving Account Rizek controlled.

142. Rizek and IYS Ventures obtained access to the ACH Float Funds by initiating ACH transfers, in writing, from the ACH Sending Accounts to the Huntington Accounts when Rizek and IYS Ventures knew or should have known that the ACH Sending Accounts did not have sufficient funds to cover them.

143. Moreover, Rizek caused IYS Ventures to obtain access to an increased amount of the ACH Float Funds in the Huntington Accounts by falsely representing in writing IYS Ventures' financial status and ability to generate cash flow.

144. Upon information and belief, Rizek executed this scheme to defraud Huntington because Rizek is an officer and/or agent of IYS Ventures, I Mart, Leanne, and Kenan.

145. As a result of Defendants' bank fraud which was executed through Rizek's written representations and ACH instructions, Huntington is entitled to a nondischargeable judgment pursuant to 11 U.S.C. §523(a)(2)(B) and to recover $5,829,551.10, which is the amount of the district court judgment against I Mart, Leanne and Kenan, plus the cost of bringing this suit and additional reasonable attorney's fees.

WHEREFORE, Plaintiff, THE HUNTINGTON NATIONAL BANK, respectfully requests that this Court enter judgment in its favor and against Defendant MUWAFAK RIZEK pursuant to 11 U.S.C. §523(a)(2)(B) determining as nondischargeable, the debt of threefold of $1,880,075.01, plus the cost of the suit and reasonable attorney's fees; and grant all other relief to it the Court deems equitable and just.

## Count II
## Embezzlement and Larceny

146.    Huntington re-alleges and incorporates by reference Paragraphs 1 through 145 as if they were fully set forth herein.

147.    11 U.S.C. §523(a)(4) excepts from an individual's discharge a debt for embezzlement, or larceny.

148.    Rizek wrongfully and without Huntington's consent caused the funds in the Huntington Accounts to be overdrawn through their transfer of funds via wire transactions from Huntington to Defendants in their Wire Receiving Accounts.

149.    Huntington has a superior right to the Overdraft Funds under the Deposit Account Agreement and the TM Services Agreement.

150.    Huntington has an absolute and unconditional right to the immediate possession of the Overdraft Funds under the Deposit Account Agreement and the TM Services Agreement.

151.    Prepetition Huntington made a demand for the return of the Overdraft Funds by sending the Demand Notice to Rizek and each of the entities he controls.

152.    Upon receipt of the prepetition demand, Rizek failed to return the Overdraft Funds or respond to the Demand Notice and none of the entities Rizek controls have returned the Overdraft Funds, therefore, Rizek wrongfully assumed control, dominion, or ownership of the Overdraft Funds without authorization.

153.    As a result of Defendants' theft of in the amount of the Overdrafts, Huntington is entitled to a nondischargeable judgment pursuant to 11 U.S.C. §523(a)(4) and to recover $5,829,551.10, which is the amount of the district court judgment against I Mart, Leanne and Kenan, plus the cost of bringing this suit and additional reasonable attorney's fees.

WHEREFORE, Plaintiff, THE HUNTINGTON NATIONAL BANK, respectfully requests that this Court enter judgment in its favor and against Defendant MUWAFAK RIZEK pursuant to 11 U.S.C. §523(a)(4) determining as nondischargeable, the debt of threefold of $1,880,075.01, plus the cost of the suit and reasonable attorney's fees; and grant all other relief to it the Court deems equitable and just.

Dated: August 24, 2023                     Respectfully submitted,

                                         THE HUNTINGTON NATIONAL BANK

                    By:     */s/Kimberly Ross Clayson*_____
                                 One of its Attorneys

Kimberly Ross Clayson (Michigan P69804)
kclayson@taftlaw.com
Taft Stettinius & Hollister LLP
27777 Franklin Road Suite 2500
Southfield, Michigan 48034
248-351-3000

William J. Serritella, Jr. (ARDC #6210001)
wserritella@taftlaw.com
Taft Stettinius & Hollister LLP
111 E. Wacker Drive, Suite 2600
Chicago, Illinois 60601